UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SCOTT HYTTINEN, et al.,

    Plaintiffs,

v.

KIRBY FRANTTI, et al.,

    Defendants.

_____/

Case No. 2:25-cv-20

Hon. Hala Y. Jarbou

**OPINION**

Plaintiffs Scott, Annette, and Gabriel Hyttinen live in Ishpeming, Michigan. They bring this action against police officers who entered their home to execute a warrant to arrest their niece, Jennifer Vaughan. Sergeant Kirby Frantti and Officer Ryan Kainulainen work for the City of Ishpeming Police Department. (Compl. ¶¶ 3-4, ECF No. 1.) Sergeant John Belogna and Troopers Andrew Peterson, Tyler Vargo, and Shane Hauff work for the Michigan State Police ("MSP"). (*Id.* ¶¶ 5-6.) Plaintiffs claim that these officers violated Plaintiffs' rights under the Fourth Amendment by entering and searching Plaintiffs' home. Before the Court is a motion for summary judgment by MSP Defendants Vargo, Peterson, Belogna, and Hauff. For the reasons herein, the Court will grant their motion and dismiss them from the case.

**I. BACKGROUND**

The following is a summary of the evidence, viewed in the light most favorable to Plaintiffs. On October 11, 2023, the Marquette County Circuit Court issued a bench warrant for the arrest of Vaughan due to her failure to appear in court for a hearing in a civil case. (Bench Warrant, ECF No. 13-2.) The warrant listed her address as 323 Vine Street in Ishpeming, Michigan. (*Id.*) That location is Plaintiffs' residence. (Compl. ¶ 2.)

On January 23, 2024, Troopers Peterson and Vargo went to the address on the warrant in order to locate Vaughan and arrest her. According to Vargo's bodycam video, they arrived at around 3:48 pm and then Vargo walked up to the front door. (Vargo Bodycam, ECF No. 13-4.) He knocked on the door several times, but no one responded. A dog was barking inside the home and there were lights on inside that were visible through the front window. Vargo said to Peterson, "I heard someone in there. I heard a female voice." (*Id.* 15:48:34-42.) He knocked again and received no response. He decided to call the homeowner (referring to her as "mom") and walked back to his cruiser to do so. (*Id.* 15:49:47.) He reached Scott on the phone, said he was at their residence looking for Vaughan, and asked for assistance contacting her. Vargo noted that there were lights on inside the house, that he heard someone inside, and that he could hear the dog. (*Id.* 15:53:11.) Scott's responses are not audible in the video, but Vargo ended the call. Vargo told Peterson that he had "talked to dad," who promised to "try to get a hold of [Vaughan] and tell her to come out." (*Id.* 15:53:54.)

A minute later, Vargo received a call from Annette. She told him, "Jenny is not at our house. No one is there . . . other than our dog." (*Id.* 15:54:40.) He told her he heard a voice inside; she explained that they "leave the TV on for the dog" and that their son was in Marquette with his grandmother. (*Id.* 15:54:51-58.) She claimed that "Jenny is at Angel Paris's house right now." (*Id.* 15:55:06.) Vargo asked whether she had been in contact with Vaughan. Annette responded, "Not since yesterday. That's where she was then." (*Id.* 15:55:13.) She also told Vargo, "There's a chance Jesse will be there as well." (*Id.* 15:55:26.) Vargo responded, "I'll be honest with you. That's our main concern. We need to find Jesse. He's the one we want and Jennifer was the one to lead us there." (*Id.* 15:55:34.)

2

After Vargo finished the call, he told Peterson, "Parents are in Vegas. Mom called. Said that she is not here; she's at Angel Paris's house with Jesse right now. I don't think they are aware of what's actually happening." (*Id.* 15:56:35.) "I think parents are gone and she's utilizing their house," he explained. (*Id.* 15:56:56.)

Vargo called for assistance from the Ishpeming Police Department to "clear the house." (*Id.* 15:59:40.) He also checked the front door and discovered that it was unlocked. Meanwhile, Plaintiffs' neighbor walked by and Peterson asked him whether he had seen "Jennifer" at the house recently. (Peterson Bodycam 16:08:46, ECF No. 13-6.) The neighbor responded, "Jennifer? I guess that's the girl that's supposed to live there with what's his face." (*Id.* 16:08:56.) He said he did not know her "personally," but he reported that the previous night he heard "a female voice out here calling out for her little chihuahua, Chewy." (*Id.* 16:09:20.) Peterson relayed to Vargo what he heard from the neighbor.

Four additional officers arrived shortly thereafter, and then all the officers entered the house. Video from their body cameras shows that the house has a basement, ground floor, second floor, and an attic. The officers searched every floor. The search lasted about an hour. Almost all the rooms and closets were cluttered with clothing and other objects that created potential hiding spots and likely extended the duration of Defendants' search. About halfway through the search, the officers discovered a cell phone lying on the kitchen counter. Gabriel, who later showed up at the house while the search was in progress, told officers that the cell phone belonged to "Jenny." (Peterson Bodycam (2) 16:58:04, ECF No. 13-7.) Gabriel confirmed that she had been at the house the previous day, but he said she was no longer there. (*Id.* 16:58:13.)

While other officers were still inside, Peterson spoke to a woman outside who showed him her cell phone and said that, according to Vaughan's Snapchat feed from five hours earlier,

3

Vaughan was at Angel Paris's house. (*Id.* 16:56:44.) But the woman did not know Vaughan's current location because "[Vaughan] turned her location off." (*Id.*) Peterson mentioned to her that Vaughan's phone was inside the house and the woman said that Vaughan had "more than one phone." (*Id.* 16:57:12.)

Peterson left the house at about 5:00 pm. (*Id.* 16:59:50.) Vargo left the house at about 5:07 pm. (Vargo Bodycam (2) 17:07:52, ECF No. 13-5.) Belonga left at about 5:17 pm. (Belonga Bodycam (2) 17:17:03, ECF No. 13-9.) Defendants did not find Vaughan or anyone else inside the home.

Plaintiffs' complaint asserts two claims under the Fourth Amendment: illegal entry into their home (Count I) and illegal search of their home (Count II). The MSP Defendants seek summary judgment on both claims.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of demonstrating that there is no genuine dispute of material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249 (citing *First Nat'l Bank of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288-89 (1961)).

Summary judgment is not an opportunity for the Court to resolve factual disputes. *Anderson*, 477 U.S. at 249. The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

4

### III. ANALYSIS

Defendants argue that they are entitled to qualified immunity because they did not violate Plaintiffs' rights under clearly established law. "At summary judgment, a government official is entitled to qualified immunity unless the evidence, viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that '(1) the defendant violated a constitutional right; and (2) the right was clearly established.'" *Raimey v. City of Niles*, 77 F.4th 441, 447 (6th Cir. 2023) (quoting *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680-81 (6th Cir. 2013)). "If either prong is not met, then the government officer is entitled to qualified immunity." *Doe v. Mia. Univ.*, 882 F.3d 579, 604 (6th Cir. 2018). The Court can consider the two prongs in any order. *Gambrel v. Knox County*, 25 F.4th 391, 401 (6th Cir. 2022).

For the second prong, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "Although 'a case directly on point' is not necessary to overcome qualified immunity, 'existing precedent must have placed the . . . constitutional question beyond debate.'" *Linden v. City of Southfield*, 75 F.4th 597, 602 (6th Cir. 2023) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Once the qualified immunity defense is raised, the "plaintiff bears the burden of overcoming qualified immunity." *Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021). That burden includes "pointing to legal authority that clearly shows that the constitutional question . . . should be resolved in [the plaintiff's] favor." *Linden*, 75 F.4th at 604.

**A. Count I: Illegal Entry**

"[T]he 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Payton v. New York*, 445 U.S. 573, 585 (1980) (quoting *United States v. U.S. Dist. Ct.*, 407 U.S. 297, 313 (1972)). "It is a 'basic principle of Fourth Amendment law'

5

that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Id.* at 586 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477 (1971)). But, "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Id.* at 603; *see Cain v. Rinehart*, No. 22-1893, 2023 WL 6439438, at *3 (6th Cir. July 25, 2023) ("Although the task force members did not have a search warrant for the Glastonbury address, the arrest warrant for Mathis, who they believed resided there, gave them limited authority to enter the home."). There are two components to this inquiry: "the officers must have reason to believe the home is the subject's dwelling *and* that the subject is inside." *United States v. Essex*, No. 21-6137, 2022 WL 17078717, at *2 (6th Cir. Nov. 18, 2022) (citing *El Bey v. Roop*, 530 F.3d 407, 416 (6th Cir. 2008)).

The Court of Appeals for the Sixth Circuit has "at times vacillated between a 'probable cause' and a lesser 'reasonable belief' standard to define whether an officer fairly had 'reason to believe the suspect is within [the dwelling].'" *United States v. Cammon*, 849 F. App'x 541, 544 (6th Cir. 2021) (quoting *United States v. Baker*, 976 F.3d 636, 642 (6th Cir. 2020)). Defendants rely on *United States v. Pruitt*, 458 F.3d 477 (6th Cir. 2006), in which the Court of Appeals concluded that officers needed only "reasonable belief" to enter a residence to enforce an arrest warrant. *Pruitt*, 458 F.3d at 482. But in a later case, the Court of Appeals concluded that *Pruitt*'s opinion regarding a reasonable-belief standard "is merely dicta," and that probable cause is the appropriate standard. *United States v. Hardin*, 539 F.3d 404, 412 (6th Cir. 2008). So far as the Court can tell, the debate about which standard applies, either a reasonable belief or probable cause, remains unresolved in this Circuit. *See Essex*, 2022 WL 17078717, at *2 (noting that the "meaning of *Payton*'s 'reason to believe' language . . . has eluded our review").

6

"Reasonable belief is established by looking at common sense factors and evaluating the totality of the circumstances." *Pruitt*, 458 F.3d at 482.  For example, "an anonymous tip coupled with information collected a month prior to arrest about the subject's presence around the premises" has been found sufficient to meet this requirement.  *Id.* (discussing *United States v. McKinney*, 379 F.2d 259, 264 (6th Cir. 1967)).  By contrast, probable cause generally requires "recent, eyewitness evidence connecting the suspect to the residence, and often even conduct by the suspect that demonstrates a tie to the residence." *Hardin*, 539 F.3d at 421.  Under either standard, the Court must look at the facts and evidence Defendants possessed *before* they entered the home.  *See Dickerson v. McClellan*, 101 F.3d 1151, 1155 n.3 (6th Cir. 1996) ("[W]e must consider only the facts the officers knew at the time of the alleged Fourth Amendment violation.").

Here, Defendants possessed reasonable grounds for believing that Plaintiffs' home was Vaughan's residence and that she was present there when they entered it.  First, the address Defendants searched matched the address for Vaughan that was listed on the warrant.  *See Tyson v. Willauer*, 289 F. Supp. 2d 190, 197 (D. Conn. 2003) (concluding that the officers had a reasonable belief, "based on the information in the arrest warrant, which they had no reasonable basis to question," that the suspect lived at the address listed in the warrant) (cited in *El Bey*, 530 F.3d at 417).[1]  Second, after Vargo knocked on the door, he heard a dog barking and a voice inside,

---

[1] Vargo also stated in his incident report (and indicated in his bodycam video) that he "independently verified [Vaughan's] address through SOS and TLO." (*See* Incident Rep. (Jan. 23, 2024), ECF No. 13-3, PageID.85.)  If true, that verification strengthened the reasonableness of Defendants' belief that Plaintiffs' home was Vaughan's current address.  Although the report is arguably hearsay, Plaintiffs have not objected to its use.  *See MY Imagination, LLC v. M.Z. Berger & Co.*, 726 F. App'x 272, 276 n.2 (6th Cir. 2018) (opining that "unobjected-to hearsay is admissible"); *cf.* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). *But cf. Ford v. Securitas Servs. USA, Inc.*, 338 F. App'x 483, 488 (6th Cir. 2009) (disregarding hearsay evidence challenged for the first time on appeal, when necessary to avoid a "gross miscarriage of justice").  In any case, the outcome here is the same even without the incident report in evidence.

7

which suggested someone was present.[2]  No one answered, but that behavior is not unusual for someone avoiding arrest.  *See United States v. Dunbar*, No. 22-3087, 2022 WL 17245098, at *2 (6th Cir. Nov. 28, 2022) ("[N]o one answered the door, consistent with Dunbar's fugitive status.").  Third, Vargo contacted Vaughan's relatives (the homeowners) and learned additional information that suggested the person in the house at the time was Vaughan.  Annette told Vargo that she and Scott and their son were out of town.  Although they claimed that Vaughan was at a different location nearby, they said they had not been in contact with her since the previous day, which means they could not have known her whereabouts on the day of the search.  Finally, Plaintiffs' neighbor reported that, the night before, he had heard a woman calling for the dog that was now inside the house, which did not conflict with Annette's knowledge of Vaughan's whereabouts.  With Plaintiffs out of town and unable to verify Vaughan's location that day or the night before, the officers could infer that the woman caring for the dog was likely to be Vaughan.  And because there was the appearance of someone's presence in the house at the time—lights on inside, sound from the television, an unlocked front door, and a dog—they could also infer that Vaughan was still at the house.  In other words, even when construing the evidence in Plaintiffs' favor, Defendants possessed a reasonable belief that Vaughan lived there and was present at that time.

On the other hand, Defendants arguably lacked probable cause to enter the house because they did not possess recent, eyewitness evidence that Vaughan was inside Plaintiffs' home.  The warrant issued about three months before Defendants entered the home, so its information was not particularly recent.  And the neighbor did not know or specifically identify Vaughan; he only reported hearing a woman's voice calling for the dog.  Nevertheless, Defendants are entitled to

---

[2] That voice is not audible in the bodycam video, but there is no dispute that the television was on inside the house. Vargo would not necessarily have known whether any voice he heard was from the television or from an individual inside.

8

immunity because it was not clearly established that the probable-cause standard applies. Even after *Hardin*, the Court of Appeals has recognized that probable cause may not be the proper standard. *See Dunbar*, 2022 WL17245098, at *2 ("Our court has not resolved whether 'reasonable belief' amounts to probable cause or something less."). That being the case, reasonable officials in Defendants' position would not have known that they had to comply with that standard. They could have reasonably assumed that all they needed was a reasonable belief that Plaintiffs' house was Vaughan's residence and that she was present when Defendants entered the building.

Plaintiffs question Defendants' motive for entering the home, noting that Vargo asserted that finding Jesse was Defendants' "main concern" and that Jesse was the reason why Defendants wanted to find Vaughan. Plaintiffs contend that entering their home to find Jesse was unlawful. But Defendants' personal motives are irrelevant. The Fourth Amendment standard is an objective one. "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.'" *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)). As indicated, Defendants have met that standard under clearly established law. They had reason to believe Vaughan was present and living at Plaintiffs' home. It does not matter whether Defendants intended to find Jesse.

Defendants also cite *Steagald v. United States*, 451 U.S. 204 (1981), in which the Supreme Court held that an arrest warrant alone does not permit police officers to search the home of a *third party* for the subject of an arrest warrant. *Id.* at 215. That case is inapposite because Vaughan was the target of the warrant and Defendants had reason to believe they were entering Vaughan's home. Even if Defendants knew that other individuals also lived there, *Payton* and *Pruitt* permitted Defendants' entry. *See El Bey*, 530 F.3d at 416-19 (rejecting claim by a plaintiff who was not the

9

target of the arrest warrant because the officers had reason to believe that the target lived at the plaintiff's home). Accordingly, Defendants are entitled to qualified immunity for Plaintiffs' illegal-entry claim.

### B. Count II: Illegal Search

Plaintiffs also claim that Defendants violated the Fourth Amendment by *searching* their home. In their response brief, however, Plaintiffs' legal arguments focus solely on whether Defendants had a reasonable basis for *entering* their home under *Payton* or *Pruitt*. (Pls.' Resp. Br. 10-13, ECF No. 24.) They do not argue that the search was a separate violation. Nor do they meet their burden to show that Defendants are not entitled to qualified immunity for that claim. Thus, Plaintiffs have forfeited this claim.

At any rate, "[w]hen officers have obtained an arrest warrant and they have reason to believe that the suspect is inside the house, they may search anywhere that the suspect might reasonably be found." *United States v. Stover*, 474 F.3d 904, 911 (6th Cir. 2007). The bodycam videos show Defendants looking through rooms and closet spaces where an individual could potentially hide. There is no evidence that their search exceeded that scope. There is also no evidence that the search exceeded what was reasonable in terms of its duration. The size of the house and its contents necessitated a lengthy search. Although other individuals (including Gabriel and a neighbor) told Defendants while the search was still underway that Vaughan was at another location, they provided little or no information to support that assertion. To be sure, a neighbor did tell Trooper Peterson that Vaughan's Snapchat feed indicated that Vaughan had been at Angel Paris's house earlier in the day; however, the neighbor did not know Vaughan's current location, and Defendants had to weigh her information against the fact that Vaughan's cell phone was still inside Plaintiffs' home. In these circumstances, it was reasonable for Defendants to complete their search of the entire home to confirm that Vaughan was not present. Plaintiffs have not shown that

these actions violated clearly established law. Thus, Defendants are entitled to summary judgment for this claim as well.

### C. Discovery

In passing, Plaintiffs argue that discovery is necessary "to determine why Defendants needed six armed officers to serve a 104 day old bench warrant, who was the true target of their search, why they searched where they did when everyone was telling them that whomever they sought - whether Jennifer and/or Jesse - were to be found just 2 minutes away." (Pls.' Resp. Br. 13.) However, Plaintiffs do not explain how any of those facts are relevant to their claim. Plaintiffs apparently believe that their claims would survive by showing that Jesse Paris (or someone else) was the "true target" of Defendants' search. For reasons discussed above, they are mistaken. The test is an objective one. It is not clear how any answers to Plaintiffs' questions would undermine the objective reasonableness of Defendants' actions. Rule 56 requires a nonmovant to show "by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). Plaintiffs have not specified the facts they need or the reasons those facts are essential to their opposition. Accordingly, the Court is not persuaded that discovery is necessary before ruling on Defendants' motion.

### IV. CONCLUSION

For the reasons stated, Defendants Belogna, Peterson, Vargo, and Hauff are entitled to qualified immunity. Therefore, the Court will grant their motion for summary judgment and dismiss them from the case.

The Court will enter an order consistent with this Opinion.

Dated: September 29, 2025                    /s/ Hala Y. Jarbou
                                             HALA Y. JARBOU
                                             CHIEF UNITED STATES DISTRICT JUDGE